**JONATHAN CORPORATION, Plaintiff,**

v.

**PRIME COMPUTER, INC., Defendant.**

**Civ. A. No. 86–582–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

March 18, 1987.

---

Conrad M. Shumadine, Willcox & Savage, P.C., Norfolk, Va., for plaintiff.

Wayne Lustig, Guy, Cromwell, Betz & Lustig, Virginia Beach, Va., for defendant.

## OPINION AND ORDER

REBECCA BEACH SMITH, United States Magistrate.

This matter comes before the court pursuant to plaintiff's "Motion To Compel Answers To Deposition Questions And For A Ruling That The Lawyer/Client Privilege Has Been Waived In Regard To A Specific Document," filed on January 21, 1987. The "Specific Document" at the center of this motion, attached as Exhibit A to the motion, is a memorandum dated January 16, 1985, from Marvin Scruggs to Bruce Mountjoy, which document the defendant claims is protected by the attorney-client privilege. Plaintiff contends that even if the attorney-client privilege ever protected this memorandum, such privilege was waived by the voluntary production of the document to plaintiff by defendant's agent in the regular course of business.

A hearing was held in this court on January 22, 1987, pursuant to plaintiff's motion. As defendant was not afforded an opportunity to respond adequately to plaintiff's motion, filed on January 21, 1987, by the time of the hearing, this court reserved ruling on the matter. The court gave both parties the opportunity to respond to the arguments and issues presented at the hearing and to provide the court with additional pertinent authority.

In its response to plaintiff's motion to compel, filed after the January 22 hearing on January 28, 1987, the defendant requested an evidentiary hearing on the questions of whether the document met "confidentiality" standards for it to be denominated as an attorney-client privileged document in the first instance; and, if so, whether defendant's agent was in a position to waive any privilege attaching to the document. Pursuant to this request, the court held an evidentiary hearing on March 2, 1987, at which time both parties were given the opportunity to present evidence relevant to this matter. At this hearing, the court again reserved full ruling on plaintiff's motion pending review of the evidence presented and the authorities cited.

### Factual Background

The facts pertinent to this dispute are uncontroverted. The dispute centers on a memorandum prepared by one of Prime Computer, Inc.'s (hereinafter referred to as "Prime") in-house attorneys, Marvin Scruggs, for Prime's branch administrator, Bruce Mountjoy. While the memorandum contains Mr. Scruggs' legal interpretation of a disputed agreement between Jonathan Corporation (hereinafter referred to as "Jonathan") and Prime, it was not marked as "confidential" or as containing "attorney-client privileged" information. In addition to Mr. Mountjoy, the memorandum is designated on its face as being distributed to five (5) other individuals, including a Mr. C. Hauger, Prime's market representative

responsible for the relevant portion of Jonathan's account with Prime.[1]

Shortly after the preparation of the memorandum on January 16, 1985, Mr. Hauger was involved in negotiations with Jonathan's sales manager, Mr. Kay Rodney Turner, concerning a contractual dispute. Mr. Hauger was Prime's sole representative to deal with Jonathan on this matter. During the course of these negotiations and in an attempt to clarify and fortify Prime's position on the contract dispute, Mr. Hauger voluntarily and on his own initiative provided a copy of the memorandum to Mr. Turner.[2] The parties subsequently discussed Mr. Scruggs' interpretation of the contract and Jonathan thereafter placed this memorandum in its files. No litigation over this matter was ongoing or contemplated at this time between the parties.[3]

The dispute concerning this memorandum did not arise until the January 14, 1987 deposition by Jonathan of Mr. Chris Jesse, a Prime managerial level employee. Mr. Jesse was designated as a copyee of the memorandum. However, when Mr. Jesse was questioned by Jonathan's counsel about the memorandum, Prime's counsel asserted that the document was protected by the attorney-client privilege.[4] Mr. Jesse refused to respond to questions concerning the memorandum. Subsequently, Jonathan filed this Motion to Compel, requesting a determination that the memorandum is not protected by the attorney-client privilege.

### Legal Background

The attorney-client privilege, as recognized at common law, has been incorporated into the Federal Rules of Evidence, which is controlling in federal judicial proceedings. *See* Fed.R.Evid. 501 (1986); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir.1984). The purpose of the privilege is to promote "full and frank communication between attorneys and their clients" and to serve the public interest in the administration of justice. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). However, the Fourth Circuit Court of Appeals has held:

> Since the privilege "impedes [the] full and free discovery of the truth," and is "in derogation of the public's 'right to every man's evidence,'" *it is not "favored" by federal courts.* Accordingly the privilege is to be "*'strictly confined within the narrowest possible limits* consistent with the logic of its principle.'"

*In re Grand Jury Proceedings*, 727 F.2d at 1355 (*quoting Herbert v. Lando*, 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979); *Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th Cir.1981); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973)) (emphasis added) (footnotes omitted); *see United States v. (UNDER SEAL)*, 748 F.2d 871, 875 (4th Cir.1984) (attorney-client privilege must be strictly construed).

The proponent of the attorney-client privilege bears the burden of demonstrating its applicability. *See, e.g., (UNDER SEAL)*, 748 F.2d at 876; *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982). Under this burden, the "proponent must

---

**1.** While the memorandum is addressed to Bruce Mountjoy, five (5) other Prime employees are designated on the face of the memorandum as copyees. These individuals are: C. Hauger; D. Buckley; W. Jesse; J. Silvia; and S. Verma.

**2.** Jonathan had entered into an agreement for lease of certain computers from Prime, including lease of some software from Prime. At the time Mr. Hauger gave the memorandum to Mr. Turner, the parties were disagreeing over the maintenance aspects of the agreement (Preferred Service Schedule and Addendum there-

to). However, the portions of the memorandum which now seem of primary importance relate to Mr. Scruggs' legal opinion regarding the lease provisions of the agreement.

**3.** Defendant specifically stated in response to the court's inquiry at the hearing on January 22, 1987, that no claim of attorney work product was being made in regard to the memorandum.

**4.** *See supra* note 3.

establish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege has not been waived." *Jones,* 696 F.2d at 1072 *(citing United States v. Bump,* 605 F.2d 548, 551 (10th Cir.1979); *United States v. Stern,* 511 F.2d 1364, 1367 (2d Cir.1975); *In re Horowitz,* 482 F.2d 72, 81–82 (2d Cir. 1973)).[5]

 It is well-settled that the attorney-client privilege does attach to corporations as well as to individuals. *See Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985); *United States v. Louisville & Nashville R. Co.,* 236 U.S. 318, 336, 35 S.Ct. 363, 369, 59 L.Ed. 598 (1915). Furthermore, communications between a corporation's in-house counsel and employees of that corporation may be protected by the attorney-client privilege. *See Upjohn Co. v. United States,* 449 U.S. 383, 391, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981) (noting that the actions of even lower-level employees within the scope of their employment can "embroil the corporation in serious legal difficulties").

### Conclusions

Based upon the foregoing legal principles and facts, the court concluded at the hearings that the memorandum involved an attorney-client communication on legal matters. Mr. Scruggs was serving as in-house counsel for Prime at the time he wrote the memorandum giving his comments to Mr. Mountjoy, a branch administrator for Prime. Mr. Mountjoy had requested Mr. Scruggs to review the maintenance agreement in question, with supporting documentation, and render his legal opinion on the matter. Therefore, two issues are now presented to the court for resolution. First, whether the memorandum prepared by Prime's in-house attorney was intended by Prime to constitute a confidential communication to which the attorney-client privilege attached. Second, assuming that the memorandum was intended to be a confidential legal communication between attorney and client, was the voluntary production of the memorandum by Prime's marketing representative, a copyee of the memorandum and designated contact with Jonathan, during the ordinary course of business a waiver of any attorney-client privilege attaching to the document. Since this court's determination of the second issue is dispositive of this dispute, no detailed substantive analysis of the first issue will be presented.[6]

5. The Fourth Circuit Court of Appeals has adopted the test for determining the application of the attorney-client privilege set forth in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950):

> The privilege applied only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) *not waived by the client.*

*United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (emphasis added).

6. It should be noted, however, that by virtue of Prime's failure to indicate on the face of the memorandum that the document was confidential or contained attorney-client privileged information, coupled with the fact that the memorandum was distributed to six (6) employees, this court has serious doubts as to whether Prime has met its burden of demonstrating that the document was intended to be confidential. *See In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984) (stating that "a communication must be made in confidence of the relationship and under circumstances from which it may reasonably be presumed that it will remain in confidence") *(quoting Wilcoxon v. United States,* 231 F.2d 384, 386 (10th Cir.), *cert. denied,* 351 U.S. 943, 76 S.Ct. 834, 100 L.Ed. 1469 (1956)); *see also United States v. (UNDER SEAL),* 748 F.2d 871, 875 (4th Cir.1984) (intent to maintain confidentiality is inferable from the circumstances, including the absence of a specific request to maintain confidentiality).

Further, evidence presented at the March 2, 1987 hearing indicates that Prime did in fact mark certain documents as "confidential" or as containing "attorney-client privileged" information at the time the memorandum was pre-

■ It is uncontroverted that an employee of Prime and a copyee of the memorandum, Mr. Hauger, voluntarily provided a copy of the memorandum to an employee of Jonathan in the ordinary course of business during negotiations arising out of a discussion and disagreement over the terms of a contract. The Fourth Circuit Court of Appeals has held that "[a]ny disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege." *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). The privilege may even be lost by inadvertent disclosure of "privileged documents" where a party did not "take reasonable steps to insure and maintain [their] confidentiality." *In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984) (*quoting Suburban*

*Sew 'n Sweep, Inc. v. Swiss-Bernina, Inc.,* 91 F.R.D. 254, 258–59 (N.D.Ill.1981). It is clearly questionable whether Prime took any steps to insure confidentiality of this document.[7] Furthermore, "[a]ny voluntary disclosure by the client to a third party waives the privilege," not only to that document, but possibly to all communications relating to that subject matter. *United States v. Jones,* 696 F.2d at 1072; *see Champion Int'l Corp. v. International Paper Co.,* 486 F.Supp. 1328 (N.D.Ga.1980).

While Prime concedes that its marketing representative and designated contact with Jonathan did voluntarily disclose the document to Jonathan, it asserts that Mr. Hauger, who is not an officer or director of Prime, did not have the power or authority to waive the corporation's attorney-client privilege.[8] Accordingly, Prime asserts that

pared. Mr. Frank Cimler, another in-house counsel for Prime who had investigated the circumstances surrounding this matter, testified at the March 2 hearing, claiming work product in regard to the specifics of his investigation. In general, Mr. Cimler testified that he had been employed by Prime since May 29, 1986; that currently documents are marked as attorney-client privileged, if appropriate; that he has seen documents dated prior to his employment with Prime and in the time period of and pre-dating the document in question so marked as attorney-client privileged; and that he knows of no change in policy at Prime regarding marking documents as attorney-client privileged from 1985 to the present time.

7. *See supra* note 6. The distinction between an intent that a document be confidential and whether any actual steps are taken to insure that confidentiality/privilege remain intact is an important one. The first inquiry relates to whether the document was privileged in the first instance, and the second inquiry relates to whether the privilege has been waived. In other words, a party may well intend that a document be confidential, as both Mr. Scruggs and Mr. Mountjoy contend in their affidavits filed with the court on March 2, 1987; but the party may not then take the appropriate steps to protect such confidentiality. *See In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984). While this court does not need to resolve the question of whether Prime actually intended the document to be confidential, *see supra* note 6 and accompanying text, consideration is still given to actions taken by Prime to insure that appropriate steps are taken to keep the privilege intact on a document intended to be confidential and privileged. *See In re Grand Jury Pro-*

*ceedings,* 727 F.2d at 1356. Moreover, if the court were to examine intent as to confidentiality, inferences regarding intent may be drawn from the circumstances, including steps taken to insure confidentiality. *See supra* note 6 and authorities cited therein.

8. In addition, Prime also contends that a corporate Disclosure Agreement, which Prime purportedly requires all its employees to execute, somehow insulates it from having the corporate attorney-client privilege waived by its employees' actions, even within the scope of their employment. Prime asserts that Mr. Hauger, as part of his employment agreement with Prime pursuant to Prime's *Code of Conduct,* attached as part of Exhibit A to the Affidavit of Richard Lee Ballantyne, filed March 2, 1987, signed a Disclosure Agreement. Numbered paragraph 1 of that Disclosure Agreement purportedly states:

I will not disclose any information with respect to Prime's business including, but not limited to, inventions, copyrights, costs, methods, processes, proprietary, secret or confidential data *of which I become aware whether or not developed by me, except as required by my duties to Prime.* (emphasis added).

Prime argues that the disclosure of the memorandum in question by Mr. Hauger to Jonathan was contrary to the foregoing paragraph in the Disclosure Agreement. The court does not agree with Prime's argument, as the memorandum did not pertain to trade secrets, proprietary, or other confidential data as contemplated by this paragraph. Moreover, the disclosure was made by Mr. Hauger regarding his duties to Prime in his negotiations with Jonathan over the disputed maintenance agreement, after he was copied on a document not marked in any

the disclosure did not waive the corporate attorney-client privilege and that Prime has never approved or ratified such disclosure. Prime cites *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), in support of its position. Prime contends that under *Weintraub* only officers and directors of a corporation have the authority and ability to waive the attorney-client privilege for a solvent corporation.[9]

However, it is the opinion of this court that *Weintraub* does not hold that the corporate attorney-client privilege can only be waived for a solvent corporation under circumstances whereby the officers and directors themselves directly waive the privilege or expressly authorize such waiver.[10] Instead, *Weintraub* addressed the narrow issue of the control of the attorney-client privilege of a corporation in bankruptcy. *Id.* at 349, 105 S.Ct. at 1991–92. Specifical-

ly, the Court considered the issue of whether a bankruptcy trustee had the power to waive the corporate attorney-client privilege with respect to confidential communications made while the corporation was solvent. *Id.* The parties *agreed* that the officers and directors could waive the privilege for a solvent corporation, but they could not agree on who could waive the privilege for a corporation in bankruptcy in regard to pre-bankruptcy communications. *Id.* at 348–49, 105 S.Ct. at 1991–92. The court in *Weintraub* then held that the trustee of a corporation in bankruptcy has the *prospective* power to waive the corporation's attorney-client privilege with respect to pre-bankruptcy communications. *Id.* at 439–58, 105 S.Ct. at 1991–96. Accordingly, *Weintraub*'s narrow holding is not controlling in this case.

This interpretation of *Weintraub* is consistent with the Supreme Court's holding in

way as confidential or privileged. It is unclear whether he would have even been aware that the disclosure could conceivably fall within the parameters of this paragraph. However, Mr. Hauger has not testified before this court nor has any Disclosure Agreement signed by him been entered into evidence.

A sheet bearing the named signature of a "Charles A. Hauger," dated April 5, 1982, was attached as Exhibit A to Mr. Ballantyne's Affidavit filed March 2, 1987. That sheet indicates an agreement by Mr. Hauger to comply with the corporate Code of Conduct and related corporate policies. The Appendix to the Code of Conduct then contains the related corporate policies, one of which is a sample "Disclosure Agreement" to be executed by the employee. No actual Disclosure Agreement signed by Mr. Hauger has been submitted. In any event, such submission would be irrelevant given the court's conclusion that the terms of the Disclosure Agreement do not apply to this situation.

Finally, any violation of the Disclosure Agreement would be a matter between Prime and Mr. Hauger and would not affect the outcome of the disclosure to Jonathan. A corporation simply cannot use a blanket Disclosure Agreement to shield it from the consequences of its employees' actions with third parties, where the corporation places the employee in the position to make the disclosure and provides the employee with the information to disclose within the scope of his employment. The corporation must be held responsible for the actions of its agent in this context. *See infra* text at 698–99, 700.

9. In particular, Prime relies on the Court's statement in *Weintraub* that *"[t]he parties in this case agree* that, for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985) (emphasis added).

10. Prime's position is that even though a copy of the memorandum was provided to its employee, without any indication that the document contained confidential or privileged information, who subsequently produced the document to a third party in the ordinary course of business, the employee was without the power or authority to waive the corporate attorney-client privilege because he was not an officer or director of the corporation nor was he expressly authorized by any officer or director to so waive the privilege.

An extrapolation of this proposition, if accepted, could produce ridiculous results. For example, a corporation could provide attorney-client privileged documents to all of its employees, who could in turn provide the document to a newspaper for publication. Under Prime's position, if the corporation's officers and directors did not expressly authorize disclosure of the document, even though they did not take minimal steps to preserve its confidentiality, disclosure by the employees and subsequent publication would not constitute a waiver of the corporate attorney-client privilege.

*Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The Court in *Upjohn Co.* refused to limit the scope of the attorney-client privilege to communications between corporate attorneys and the corporate "control group." *Id.* at 391–97, 101 S.Ct. at 683–86. The Court recognized that "[m]iddle-level—and indeed lower-level—employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties...." *Id.* at 391, 101 S.Ct. at 683. The Court then extended the attorney-client privilege in that case to cover confidential legal communications between a corporation's attorneys and its employees at all levels, not just to those individuals in the corporation's "control group." *Id.* at 392–97, 101 S.Ct. at 684–86. Logically, a corporation cannot enjoy the benefits of an expanded attorney-client privilege without likewise accepting the consequences that the privilege may well be waived by an employee who is outside of the "control group." Such is the case at bar.

Prime seeks protection through the attorney-client privilege on a legal communication made to individuals outside of Prime's "control group." Then, Prime claims that while it is entitled to the benefits of the privilege on this communication, it is not responsible for any waiver of the privilege on the communication by one of these individuals outside of the "control group." In other words, the privilege can be created for the benefit of legal communications with employees at all levels but cannot be waived or destroyed by these employees. This proposition is inconsistent with a joint reading and the holdings of *Weintraub* and *Upjohn Co.*

Finally, Prime cites the cases of *Miller v. Haulmark Transport Systems,* 104 F.R.D. 442 (E.D.Pa.1984), and *United States v. Omni International Corp.,* 634 F.Supp. 1414 (D.Md.1986), in support of its position that the corporate attorney-client privilege has not been waived by Prime on the memorandum in question. However, both cases are factually distinguishable from the present case and are not controlling. In *Miller* an employee of Haulmark Transport Systems produced a memorandum during the course of her deposition, and the corporation's attorney specifically objected at the deposition to the production on the grounds of attorney-client privilege. *Id.* at 445. The court rejected the argument that the production of a document over an objection to such production on the grounds of attorney-client privilege constituted a voluntary waiver of the privilege. *Id., Miller,* therefore, involved a proper legal objection being made simultaneously with the production of the privileged document. In the case at bar, Prime voluntarily produced the document without any reservation of the attorney-client privilege prior to any litigation between the parties and during the ordinary course of their business dealings.

The case of *United States v. Omni International Corp.,* 634 F.Supp. 1414 (D.Md.1986), involved criminal tax charges against a corporate defendant and related individuals, including the corporation's attorney. The defendants moved to dismiss the indictment, to disqualify the government investigators and prosecutor, or to suppress certain evidence, claiming, *inter alia,* a violation of the attorney-client privilege. From the outset, Omni International Corporation (hereinafter referred to as "Omni") vigorously asserted the attorney-client privilege. First, in response to subpoenaed invoices of the attorney to the corporation, Omni claimed the privilege before producing the documents and the court upheld this claim. *Id.* at 1417–18. Omni then claimed the privilege in regard to interviews of its attorneys by government agents; to a proffer by its attorney, Joseph P. Bornstein, another named defendant; and to an interview with Mr. Bornstein's former secretary by government agents. However, the court found no violation of the attorney-client privilege that would require dismissal of the indictment or disqualification of the prosecutor or government investigators. *Id.* at 1423.[11]

11. Specifically, the court in *Omni* found that

Omni failed to meet its burden of showing that

While the court in *Omni* did dismiss the indictment without prejudice, did disqualify the government agents and prosecutor from participation in further prosecution of the case, and did indicate that future trial testimony of Mr. Bornstein's former secretary would be suppressed, such action was taken by the court due to the overbearing, intrusive, intolerable methods used by the government in the overall investigation and prosecution of the case. *Id.* at 1436–41.[12] The facts of *Omni* simply and clearly do not correlate with the facts of this case where an employee voluntarily produces a document during the ordinary course of business.

Based upon the facts and authorities cited herein, it is concluded that Prime has failed to meet its burden of demonstrating that the corporate attorney-client privilege has not been waived. *See United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982). It is this court's opinion that the voluntary production of the memorandum by Prime's marketing representative to Jonathan during the ordinary course of business negotiations stemming from a contract dispute waived any attorney-client privilege with respect to that document. It was incumbent upon Prime to take the necessary precautions to preserve confidentiality. *See In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir.1984).[13] Prime cannot now disclaim the voluntary disclosure of the document to Jonathan by the very individual Prime had designated to deal with Jonathan on the matter and who was specifically copied on the document not marked in any way as confidential or privileged. Prime both intentionally put the individual in a position to make the disclosure as well as gave him the information to disclose. As such, any privilege attaching to the document has been waived by Prime through its agent, Mr. Hauger, in the scope of his employment.[14]

Accordingly, the court GRANTS plaintiff's "Motion to Compel Answers to Deposition Questions And For A Ruling That the Lawyer/Client Privilege Has Been Waived In Regard To A Specific Document." The parties shall proceed with discovery in accordance with this ruling.

The Clerk shall mail a copy of this Opinion and Order to Conrad M. Shumadine, counsel for plaintiff, and to Wayne Lustig, counsel for defendant.

---

the privilege was breached by Mr. Bornstein's proffer because the procedure had been approved in advance by the court under the Code of Professional Responsibility, the government had never had access to the proffer, and by the terms of the proffer itself the information could not be used against Omni at trial. *Id.* at 1422. The court also found that the interview of Mr. Bornstein's former secretary had revealed no confidential communications. *Id.* Finally, the court found no violations of the privilege in the interviews of various Omni attorneys, as the attorneys were cognizant of the limits of the privilege and the nature of the questions and the discussion did not fall within the ambit of privileged material. *Id.* at 1422–23.

**12.** The court stated:

Factually, the misconduct here is not isolated, but longstanding. Indeed untrue testimony and a lack of candor premeated the entire ten-month [grand jury] hearing. The Government did not proffer the truth about the creation and alteration of the documents during all that time. The misconduct here is as extreme as any found in the reported decisions reviewed by this Court. Defendants and the Court clearly suffered prejudice from the misconduct.... The Court condemns the manner in which the Government proceeded, and cannot now stand idly by, implicitly joining the federal judiciary into such unbecoming conduct.

*Id.* at 1438–39.

**13.** *See supra* notes 6 and 7 and accompanying text. Also, as stated by Judge Friendly of the Second Circuit, "[i]t is not asking too much to insist that if a client wishes to preserve the privilege under such circumstances, he must take some affirmative action to preserve confidentiality." *In re Horowitz*, 482 F.2d 72, 82 (2d Cir.) *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973), *quoted by In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir.1984).

**14.** *See generally Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), as discussed *supra* in text at 698–99.